# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 4230 | **DATE** | 9/29/2004 |
| **CASE TITLE** | Cacique, Inc., et al. vs. V&V Supremo Foods, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' Motion for Summary Judgment [Doc. No. 49]; Defendants' Motion to Strike Sections of Plaintiffs' Statement of Additional facts, and to Strike Sections of Affidavits Submitted in Support of Plaintiffs' Statement of Additional Facts Pursuant to Fed. R. Civ. P. 56 [Doc. No. 74]; Plaintiffs' Motion to Exclude the Affidavit of William R. Murray

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due _____. Reply to answer brief due _____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry]    For the reasons set forth in the attached memorandum opinion and order, Defendants' motion for summary judgment [Doc. No. 49] is GRANTED in part and DENIED in part. Defendants' motion to strike sections of Plaintiffs' statement of additional facts, and to strike sections of affidavits submitted in support of plaintiffs' statement of additional facts pursuant to Fed. R. Civ. P. 56 [Doc. No. 74] is GRANTED in part and DENIED in part; Plaintiffs motion to exclude the affidavit of William R. Murray is DENIED. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | SEP 3 0 2004 | |
| X | Docketing to mail notices. | date docketed | 98 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| slf(lc) | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

CACIQUE, INC. AND CACIQUE )
DISTRIBUTORS, U.S. )
                          )
        **Plaintiffs,** )
                           )    No.  03 C 4230
        **v.** )
                           )    **HONORABLE DAVID H. COAR**
V&V SUPREMO FOODS, INC. AND )
WILFORD PARKER )
                           )
        **Defendants.** )

DOCKETED
SEP 3 0 2004

## MEMORANDUM OPINION AND ORDER

Before this Court is V&V Supremo Foods, Inc. and Wilford Parker's (collectively, "Defendants")

motion for summary judgment on Plaintiffs' Cacique, Inc. and Cacique Distributors, U.S.'s

(collectively, "Plaintiffs" or "Cacique") complaint.  In addition, Defendants and Plaintiffs have

filed motions to strike certain documents and Local Rule 56.1 materials from the record.  For the

reasons set forth below, Defendants' motion to strike is GRANTED in part and DENIED in part.

Plaintiffs' motion to strike is DENIED.  Defendants' motion for summary judgment is

GRANTED in part and DENIED in part.

## PARTIES' MOTIONS TO STRIKE

Before the Court can address Defendants' motion for summary judgment, it must address the

motions to strike filed by the Parties, in order to determine whether certain evidence should not

be considered in evaluating Defendants' motion for summary judgment.  Each motion to strike

will be addressed in turn.

# I. Defendants' Motion to Strike

Defendants have filed a motion to strike a number of documents filed by the Plaintiffs in opposition to V&V Supremo Foods, Inc.'s ("V&V") motion to strike. Defendants move to strike several paragraphs in the declarations of William Moore ("Moore"), Ernest Ramirez ("Ramirez"), Tirso Iglesias ("Iglesias"), and Gilbert de Cardenas, Jr. (" de Cardenas, Jr."), and the entire declaration of George Salmas ("Salmas"). In addition, V&V moves to strike specific paragraphs of Plaintiffs' Rule 56.1(b)(3)(B) Statement of Additional Facts filed in opposition to Defendants' motion for summary judgment. Each of the items Defendants seek to strike from the record will be addressed in turn.

## A. William Moore

### 1. Defendants' Motion to Strike Paragraphs 1, 5, 6, 8 Through 21, and the Last Sentence of Paragraph 20 of Moore's Declaration

Defendants argue that the Court should strike the above-mentioned paragraphs of Moore's declaration because Moore does not establish personal knowledge and adequate foundation for his statements in these paragraphs pursuant to Fed. R. Evid. 602. For example, V&V contends, Moore lacks personal knowledge of Plaintiffs' alleged research, marketing or selling strategies during the time that Parker was employed with Cacique. In Paragraph 1 of his declaration, Moore states that he has been employed as the Chief Executive Officer for Sales and Marketing of Cacique, Inc. and Cacique Distributors, U.S. since January 2, 2002. (See Moore Decl., ¶ 1). However, Defendants note, Plaintiffs terminated Wilford Parker's employment on January 7, 2002. Consequently, Defendants contend, Moore lacks personal knowledge of Plaintiffs' research, marketing or sales strategies when Parker was employed– i.e., before Moore

himself was employed. In addition, Defendants contend that Moore lacks personal knowledge of the steps that Plaintiffs took to protect any confidential information when Parker was employed. Defendants also assert that the above-mentioned paragraphs should be stricken because Moore does not establish any foundation. For example, Defendants argue, Moore does not provide any foundation in paragraph 5 to support his contention that, "Cacique is the only brand of Hispanic dairy products sold nationally." (See Moore Decl, ¶ 5). Plaintiffs refute V&V's contention that Moore does not provide an adequate foundation for the information contained in his declaration, and assert that Moore has adequately established his personal knowledge and foundation for any facts stated.

Defendants argue that Plaintiffs' declarations do not comply with the requirements of Fed. R. Civ. P. 56(e). In relevant part, Rule 56(e) states:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Defendants are correct when they assert that Moore has no personal knowledge concerning whether the policies in question were in place prior to Parker's termination. Moore cannot personally attest to the policies in place prior to his tenure with Cacique. While he may have had an awareness of those policies, that awareness is not based on his personal knowledge, as he was not employed by Cacique during the relevant time period. Therefore, Cacique's motion to strike the aforementioned paragraphs of Moore's declaration is granted, with the exception of paragraphs 10, 12, 17 and 21, for the reasons explained in the section below.

### 2. *Motion to Strike Portions of Moore's Affidavit Pursuant to Fed. R. Evid. 1002*

In addition to its motion to strike portions of Moore's declaration, based on lack of foundation and personal knowledge, Cacique moves to strike other paragraphs of Moore's declaration (paragraphs 9, 10, 12, 17 and 21), because V&V contends that these paragraphs are not based upon admissible facts. Defendants argue that these paragraphs attempt to prove the contents of specific documents which are not attached as exhibits to Moore's declaration. Specifically, in these paragraphs of his declaration, Moore states:

> 9. Before a person is hired as a Cacique employee, he or she must sign a document entitled, CACIQUE, INC., CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT. Any person who declines to sign this document will not be hired by the company. When a person is hired, he or she is given a copy of the Cacique Employee Handbook which contains a section on the duty to not divulge company information to third parties.
>
> 10. Cacique has policies that restrict the use of computers, office e-mail systems and internet e-mail systems. Employees are told in writing that all information contained in Cacique's computer systems is Cacique's property and none of it is the employee's personal property. Employees are instructed that they should have no expectation of privacy respecting information contained in Cacique's computers.
> \*\*\*\*\*
> 12. At the end of each employee's employment with Cacique, the former employee receives a letter from Caciques' attorneys reminding him or her they the duty to protect Caciques' confidential information extends beyond the end of employment with Cacique.
> \*\*\*\*
> 17. Visitors are permitted to Caciques' facilities for business purposes only after making an appointment at least 24 hours before the visitor is schedule [sic] to arrive. Upon arrival, the visitor is required to sign a "visitors log" which states his or her name, company affiliation, time of arrival, and the name of the Cacique employee with whom the visitor has come to confer. Visitors are required to sign visitor confidentiality agreements before gaining access to Cacique's premises. Visitors to Cacique's properties are escorted during their visit by Cacique's employee with whom the visitor has come to meet.
> \*\*\*\*

21. Companies that supply goods or services to Cacique are required to sign a Vendor Nondisclosure Agreement before they are permitted to do business with Cacique. This agreement obligations them to maintain the confidentiality of Cacique's confidential information to which they may be exposed while providing goods or services to Cacique. The employees of the suppliers are required to sign visitor confidentiality agreements when they come to Cacique premises.

(See Moore, Decl., ¶¶ 9-10, 12, 17 and 21). According to Fed.R.Evid. 1002, "To prove the content of a writing, recording or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Federal Rule of Civil Procedure 56(e) requires that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Fed. R. Civ. P. 56(e). However, documents that are relied upon, but not referred to, do not need to be attached. Lennon v. Christoph, No. 94 C 6152, 1997 WL 57150 at * 14 (N.D. Ill. Feb. 7, 1997) (quoting Chicago Dist. Council of Carpenter's Pension Fund v. Anthony Floor and Wall Covering Co., No. 93 C 7246,1994 WL 65004 at *2 (N.D. Ill. 1994)).

Defendants are correct that in his declaration, Moore refers to the specific documentation relied upon in paragraph 9, 17 and 21 yet failed to attach the documents which are referred to in making the assertions in paragraph 9. However, in paragraphs 10 and 12, Moore does not refer to any specific documentation in making the assertions in those paragraphs. Consequently, the Court will strike paragraphs 9, 17 and 21, but will not strike paragraphs 10 and 12. The Court will note, however, that since Moore does not have personal knowledge of the policies when Parker was employed, they may only be used to establish Cacique's policies since Moore has been employed with Cacique, and not any time prior to that.

### B. Ernest Ramirez

Defendants contend that paragraphs 8, 10, and the next to last sentence of paragraph 5 in Ramirez' declaration lack adequate foundation, and consequently, those paragraphs are not admissible evidence pursuant to Fed.R.Evid. 602 and should be stricken. Defendants note that from April 2001 to early 2004, Ramirez states that he lived and worked in California. V&V contends that Ramirez does not provide any foundation to establish that he had personal knowledge of the Hispanic-style cheese markets in Chicago during the period he lived in California, and therefore, Ramirez does not establish adequate foundation for paragraphs 8 and 10 of his declaration. However, the fact that Ramirez lived in California from April 2001 to early 2004 does not establish that he lacks personal knowledge of the Hispanic-style cheese markets in Chicago, Illinois during the time period when Ramirez worked in California. The fact that he possessed a general knowledge about the Hispanic-style cheese market provides an adequate foundation for Ramirez to testify about Chicago's Hispanic-style cheese market, at least for purposes of this motion. Because V&V has not established that Ramirez lacks personal knowledge of the information in the paragraphs of his declaration that Defendants move to strike, V&V's motion is denied.

### C. Tirso Iglesias

#### 1. Defendants' Motion to Strike Paragraphs 3, 4 and 11

As with Moore and Ramirez' declarations, Defendants move to strike portions of Iglesias' declaration, and argue that Iglesias does not establish personal knowledge and adequate foundation for his statements in these paragraphs. Specifically, V&V argues that Iglesias does not identify a basis for his statements that Plaintiffs invested a "substantial amount of time and

effort" in tracking its sales volume (See Iglesias Decl., ¶ 3). Additionally, Defendants argue that Iglesias does not establish any foundation to support his assertion that Plaintiffs, "have done research into the mix of the products that its consumers purchase." Id. Similarly, V&V argues, Iglesias does not provide any foundation for his statement that, "[S]tore # 5 makes special efforts to cater to a Mexican clientele." (See Iglesias Decl., ¶ 4) Finally, V&V argues, Iglesias does not lay any foundation for his conclusion in Paragraph 11 about consumers' decisions to switch products. Therefore, Defendants argue, the Court should strike these paragraphs, because they are not based on admissible facts.

As with its arguments about the declarations of Moore and Ramirez, Defendants' arguments to strike portions of Iglesias' declaration lack merit. In the first paragraph of his declaration, Iglesias establishes that he is Cacique Distributors, U.S.'s Vice-President of National Sales, and has been employed by Cacique, Inc. and Cacique Distributors, U.S. in various sales and marketing positions since 1982. (See Iglesias aff., ¶ 1). By testifying to his 22-year work experience with Cacique, Iglesias has laid an adequate foundation to testify to the matters which Defendants seek to strike from the record. Consequently, Defendants' motion to strike these paragraphs from Iglesias' declaration is denied.

### 2. Defendants' Motion to Strike Paragraphs 9 Through 11

Defendants also argue that the Court should strike paragraphs 9 through 11 of Iglesias' declaration, because they include facts that are not admissible evidence pursuant Fed. R. Evid. 1002. Defendants note that in paragraphs 9, 10 and 11, Iglesias attempts to prove the results of Cacique's consumer studies, yet fails to attach those consumer studies as required by Fed. R. Evid. 1002. Therefore, Defendants contend, paragraphs 9 through 11 should be stricken.

Again, the Court notes that only paragraphs that make a specific reference to, as opposed to relying upon, particular documentation will be stricken for failure to adhere to Fed. R. Evid. 1002. While Iglesias relies upon Cacique's consumer studies to make the specific assertions in paragraphs 9 through 11, he does not make specific reference to the particular documentation that comprises Cacique's consumer studies. Rather than referencing what the specific consumer studies said, establishes how Cacique has relied on the studies to target their consumers in the particular manner that it does. Essentially, he speaks to the actions that Cacique took after conducting the consumer studies, rather than the specific details of the consumer studies. Consequently, he was not required to attach as documentation Cacique's consumer studies. Therefore, V&V's motion to strike these paragraphs of Iglesias' declaration is denied.

### 3. Defendants' Arguments to Strike Paragraphs 12 Through 14 of Iglesias' Declaration

V&V notes that paragraphs 12 through 14 of Iglesias' declaration discuss Plaintiffs' marketing strategy for their Mexican pourable cream. Defendants contend that during discovery, V&V requested that Plaintiffs identify all of their alleged trade secrets at issue in this case, including any marketing and sales strategies. Defendants contend that Cacique never disclosed this specific strategy, nor did they ever supplement their discovery responses. V&V contends that none of the documents produced describe the strategy set forth in Plaintiffs' memorandum in opposition to Defendants' motion for summary judgment (and, Defendants contend, Plaintiffs do not refer the Court to any documents). Additionally, Defendants argue, Plaintiffs' Rule 30(b)(6) corporate designee for the trade secrets at issue in this case--de Cardenas--never described this strategy at any time during his deposition.

Plaintiffs counter Defendants' arguments and contend that between the Dahr report and the deposition testimony de Cardenas, Plaintiffs' pourable cream strategy was not a surprise to Defendants. Plaintiffs contend that in addition to the disclosures made during discovery by Sanjay Dhar in his 2003 expert report, in October 2003, de Cardenas testified that product mix was an important trade secret of Cacique, and that it is the particular product mix that Cacique focuses on in various areas around the country that are part of the trade secret marketing plans. Plaintiffs note that deCardenas specifically mentioned cream type cheeses. Plaintiffs contend that V&V's counsel failed ask any follow-up questions about pourable creams. Cacique believes that V&V's failure to follow-up should not result in the exclusion of Plaintiffs' evidence.

Plaintiffs are correct when they assert that Gil de Cardenas' deposition provided notice of the pourable cream strategy, and as such, Cacique cannot be faulted for V&V counsel's failure to ask follow-up questions. Based upon the deposition testimony, this Court cannot conclude that there was a failure on the part of Cacique to disclose this information, as there was adequate notice to V&V that strategies related to cream cheeses was a topic that Cacique considered to be a trade secret. (See Dep. Tr. of de Cardenas, p.267, line 1-p.269, line 1). Therefore, the Court will not strike paragraphs 10 through 13 and 15 of de Cardenas' declaration.

### D. Gilberto de Cardenas, Jr.

*I. Defendants' Motion to Strike Paragraphs 10 through 13, 15, 18, 19, 21, 23, 24, 34, 44, 46, the last three sentences of paragraphs 3 and 14, and the third and last sentence of paragraph 35 of de Cardenas, Jr.'s Declarations*

Defendants argue that these paragraphs of de Cardenas Jr.'s declaration should be stricken because de Cardenas, Jr. does not establish any foundation for his statements in these

paragraphs, and therefore, these statements are not admissible pursuant to Fed. R. Evid. 602. For example, Defendants contend, de Cardenas, Jr. does not provide any foundation to support his conclusions about "the vast majority of Hispanic dairy product consumers" and "independent non-national grocery chains" in the last three sentences of paragraph 3. Additionally, Defendants contend, in paragraphs 18, 19, and 21, de Cardenas, Jr. does not establish any foundation regarding what is "Cacique's proprietary research" or its "competitive advantage." Additionally, Defendants contend, de Cardenas, Jr. does not establish any foundation for his beliefs in paragraph 24 of his declaration. Finally, V&V contends, de Cardenas, Jr. does not provide any foundation to support his conclusions in paragraph 44, or the third and last sentence of paragraph 35.

Defendants' arguments to strike these particular portions of de Cardenas, Jr.'s declaration are unavailing. By establishing that he has worked for Cacique for 20 years, and has been President of Cacique Distributors, U.S. since it was founded in 1995, de Cardenas, Jr. establishes a sufficient foundation in order to allow him to testify about these specific aspects of the Hispanic cheese market. (See deCardenas, Jr. Decl., ¶¶ 1-2). In addition, contrary to Defendants' assertions, de Cardenas, Jr. limits his testimony to his personal knowledge. Consequently, Cacique's motion to strike these portions of deCardenas Jr.'s declaration is denied.

   *2. Defendants' Motion to Strike Portions the Last Two Sentences of Paragraph 14 of de Cardenas, Jr.' Declaration*

Defendants also argue that the Court should strike the last two sentences of paragraph 14 of de Cardenas, Jr.' declaration, because the facts contained therein are inadmissible pursuant to

Fed. R. Civ. P. 1002. Specifically, Defendants note that in the last two sentences, de Cardenas, Jr. tries to prove the contents of the particular writings on Plaintiffs' 2001 Marketing Plan CD's. However, Defendants contend, the CDs are not attached as exhibits to de Cardenas, Jr.' affidavit. Defendants are correct that these particular sentences refers to the document that is mentioned, yet fails to attach that particular document. Consequently, the last two sentences of paragraph 14 will be stricken.

     3. *Defendants' Motion to Strike Paragraph 34 of de Cardenas Jr.'s Declaration*

Defendants contend that de Cardenas, Jr.'s statement in Paragraph 34 contradicts his prior Rule 30(b)(6) deposition testimony. On December 17, 2003, de Cardenas, Jr. testified that, in the nearly six years that he worked with Parker, Parker never lied to him, and de Cardenas, Jr. considered him to be an honest person. ( See V&V's Statement of Facts, ¶ 45). However, Defendants assert, in Paragraph 34 of his declaration, de Cardenas, Jr. states that he believes that Parker is a dishonest person. It is for this reason that V&V contends that the Court should strike Paragraph 34 of de Cardenas, Jr.'s declaration.

In comparing de Cardenas, Jr.'s deposition testimony with the declaration in his affidavit, de Cardenas, Jr. is responding to two different inquiries. In his deposition testimony, de Cardenas, Jr. is responding directly to the question of whether during the time de Cardenas, Jr. and Parker worked together, Parker ever lied to him, and to that inquiry, de Cardenas, Jr. responds "no." (See Dep. Tr. of de Cardenas, Jr., p. 652, lines 11-20). However, in ¶ 34 of de Cardenas Jr.'s declaration, he states, "While Parker worked at Cacique, I was not aware of him lying and as far as I knew he seemed honest. However, I now have reason to believe he is being dishonest in this litigation and in his work for V&V..." (See Decl. of de Cardenas, Jr., ¶ 34). It

is clear that in the first response, de Cardenas, Jr. is responding to whether he thought Parker was dishonest to him while Parker working for Cacique. In his second response, de Cardenas, Jr. is responding to the inquiry of whether he believes that Parker has been dishonest since he began working for V&V. Clearly, these are not the same inquiries, and there is no contradiction in de Cardenas Jr.'s two responses. Consequently, the Court will not strike paragraph 34 of de Cardenas', Jr.'s declaration.

### *E. George Salmas*

#### *1. Motion to Strike George Salmas' Declaration*

Defendants contend that George Salmas' declaration should be stricken because Defendants contend that Plaintiffs never disclosed him as a potential witness in this matter, either in Rule 26(a)(1) disclosures or otherwise, and that all V&V had reason to believe was that Salmas is one of Plaintiffs' attorneys of record in this case, and had no warning that he would offer testimony on any issues of fact. Plaintiffs provide no response to Defendants' motion to strike Salmas' declaration. Therefore, the Court will assume that Salmas was never disclosed as a potential witness in this matter, other than as Plaintiffs' attorney. Consequently, the Court will grant Defendants' motion to strike Salmas' declaration.

### *F. Defendants' Motion to Strike Paragraphs 8, 15, 17, 25, 26, 29, 30, 34, 36 through 38, 41, 47, 51 Through 63, and the Second Sentence of Paragraph 2 of Plaintiffs' Additional Facts Submitted in Opposition to Defendants' Motion for Summary Judgment*

V&V notes that as stated previously, Defendants contend that the Court should strike all paragraphs submitted by Plaintiffs which Defendants contend contain inadmissible evidence in violation of Fed. R. Civ. P. 56(e). Defendants contend that if the Court strikes the above-mentioned paragraphs, it should also strike Cacique's Additional Facts which rely solely upon the inadmissible evidence for support. Based on the Court's above-mentioned rulings, the Court will strike the following paragraphs: the second sentence of paragraph 2, the last two sentences of 36, and will strike 51, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62 and 63 in their entirety. However, based upon the foregoing rulings on Defendants' motion to strike, the Court will not strike the following paragraphs: 8, 15, 17, 25, 26, 29, 30, 34, 37, 38, 41, 47 and 53.

### G. *Defendants' Motion to Strike Paragraphs 18, 38, 39, 42, 43, 47, 66 and 67 of Cacique's Additional Facts* Because They are Arguments Rather Than Facts

Defendants contend that the above-mentioned paragraphs of Cacique's statement of facts should be stricken, as they are arguments rather than facts. Defendants note that pursuant to this Court's standing order for Motions for Summary Judgment, a party opposing a motion for summary judgment may include a statement of additional facts in support of its opposition to the motion for summary judgment. According to the Court, these facts should follow the format of the L.R. 56.1(a)(3) statement and "should be limited to actual facts; arguments masqueraded as facts will not be considered by the court." While the Court notes that some of the above-mentioned paragraphs do include argument rather than fact, the Court will not strike any of these paragraphs in their entirety. As the Court's standing order dictates, any arguments masqueraded as fact will not be considered when examining Plaintiffs' evidence in opposition to Defendant's

motion for summary judgment. However, the Court will not strike these paragraphs in their entirety. Consequently, Defendant's motion to strike the aforementioned paragraphs is denied.

## II. Plaintiffs' Motion to Strike Evidence Included in the Affidavit of William R. Murray

Plaintiffs note that in paragraph 6 of William Murray's affidavit, the affiant asserts that he was told by several of the distributor's references that Cacique personnel had been meeting with distributors in the field and discussing the Cacique 2001 Marketing Plan with them. (See Aff. of William R. Murray, ¶¶ 5-6). Plaintiffs believe that this statement is being made to assert its truth, and therefore, should be excluded pursuant to the hearsay rules. Plaintiffs believe that since the distributors and Cacique personnel referenced in Murray's affidavit are unidentified, there is no applicable hearsay exception and therefore no basis for admitting the evidence.

Defendants contend that the statements of paragraph 6 of William Murray's affidavit should not be excluded, as they are not being offered to prove the truth of the matter asserted. Defendants contend that the statements of paragraph 6 are not offered to prove that Plaintiffs' personnel in fact had been meeting with distributors in the field to discuss Plaintiffs' 2001 Marketing Plan with them, but rather, Murray's testimony is offered to establish that Plaintiff's distributors talk to third parties, such as consultants like Murray, about Plaintiffs' competitors. Thus, Defendants contend, Murray's testimony goes to the separate issue that distributors regularly speak to competitors about other competitors, and whether their statements are true is not really the point. Defendants contend that this testimony corroborates other evidence in the record to support Defendants' proposition that Plaintiffs cannot reasonably rely on distributors to keep any information confidential, as they speak to whomever they choose, without restriction.

The Court will consider this testimony, not to prove the truth of the matter asserted, but rather to attempt to establish that Plaintiffs' distributors talk to third parties about Plaintiffs' competitors. Consequently, this evidence will be used in evaluating Defendants' motion for summary judgment. Plaintiffs' motion to strike is denied.


## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. Factual Background[1]

### *A. The Companies*

Cacique, Inc., is a California corporation, with its principal place of business in City of Industry, California. Cacique, Inc. manufactures Cacique-brand products. Cacique Distributors, U.S. is a California corporation having its principal place business in La Puente, California. Cacique Distributors, U.S. is also known by the name "Cacique, U.S.A." Cacique, Inc. sells all of its products to Cacique Distributors, U.S., which in turn, markets and sells them throughout the United States. Cacique, Inc. provides marketing support to Cacique Distributors, U.S. Together, the two companies claim to be the largest marketer and seller of Hispanic-style cheeses in the United States. Gilbert de Cardenas, Sr. ("de Cardenas, Sr."), is the chairman of the board of Cacique, Inc. and Cacique Distributors, U.S.

Defendant V&V is an Illinois corporation, with its principal place of business in Chicago, Illinois. It is one of the largest manufacturers of Mexican-style cheeses in the Midwest. Phillip

---

[1] Unless otherwise noted, the following undisputed facts are taken from the Parties' Local Rule 56.1 materials.

Villasenor is responsible for V&V's manufacturing operations. Gilberto Villasenor, II is responsible for V&V's sales and marketing activities.

Cacique considers V&V to be a significant competitor in three markets: (1) Chicago (which includes Chicago and its surrounding area); (2) the Southeast; and to a lesser degree (3) Texas. However, the companies compete in other areas of the country as well. Cacique's principal competitor in the Chicago market is V&V. Cacique believes V&V commands about 50 to 60 percent of the market in Chicago, while Cacique has about 10 to 12 percent. Cacique's principal competitor in the Southeast also is V&V. Cacique believes V&V commands about 50 to 60 percent of the market in the Southeast, while Cacique has about 30 to 40 percent of the Southeast market. In the Texas market, Cacique believes it commands about 60 percent of the market, while V&V believes that it commands about 15 percent of that market.

### B. Wilford Parker

The current litigation between the parties arises from one critical decision: Defendant Parker's decision to work for V&V after being terminated from a significant tenure with Cacique. In addressing Parker, the Court will discuss his employment history: (1) prior to Cacique; (2) with Cacique; (3) subsequent to Cacique, but prior to working with V&V; and (4) with V&V.

#### 1. Parker's Employment Experience Prior to Joining Cacique

In 1967, Parker received a Bachelor's Degree in Economics from Lafayette College in Easton, Pennsylvania. He then served in the United States Army from September 1968 through August 1971. In 1975, Parker received a Masters in Business Administration from Duquesne University in Pittsburgh, Pennsylvania. Subsequently, Parker was employed by H.J. Heinz as a

Production Planning and Inventory Control ("PPIC") analyst. As a PPIC analyst, Parker developed a production plan based on sales and marketing estimates. Later, as a Sales Administration Coordinator, Parker reported to the National Sales Manager and worked on projects that included developing and implementing a Sales Information System, and he trained the sales representatives to use that system. Before Parker terminated his employment at H.J. Heinz seven years later, he had been promoted to District Sales Manger for the Denver district. Following his employment at H.J. Heinz, Parker worked for approximately four years at Swift & Company as a District Sales Manager for the Detroit district selling perishable foods through brokers and a direct sales force. Next, Parker worked with the Greatwestern Sugar Company as its Western Regional Sales Manager of the company's dry grocery product division. Approximately a year later, in 1983, Parker began working for Leprino Foods, the world's largest manufacturer of mozzarella cheese. From 1983 through 1986, Parker held various positions at Leprino Foods, including National Marketing Manager for Deli and Fresh Deli Pizza, and the National Accounts Manager for Mozzarella Cheese. From 1986 through 1988, Parker worked for Beatrice Dairy Division/Meadow Gold Dairy. Meadow Gold Dairy was a full-line dairy products manufacturer, with Direct Store Delivery in seven states. Parker was its Marketing Director for the western region. From 1988 through 1994, Parker worked for Golden Cheese Company in Corona, California as its Vice President of Sales and Marketing.[2] Parker left Golden

---

[2] The Parties dispute whether Parker gained experience with Hispanic cheeses at the Golden Cheese Company. Specifically, V&V and Parker contend that Parker gained fairly extensive experience with Mexican cheeses at the Golden Cheese Company, while Cacique contends that the Golden Cheese Company sells cheddar, Colby and Monterey jack cheeses. Plaintiffs assert that while the Golden Cheese Company had an authentic Mexican restaurant chain as one of its customers, no efforts were made to target the Hispanic market.

Cheese Company in 1994, and from 1994-1996, he was an independent food industry marketing consultant. As a consultant, Parker developed and executed NAFTA exporting-type projects, deli promotions, plans to open and close companies, and a bulletin board information database for the food industry.

### 2. Parker's Employment With Cacique Distributors, U.S.

In 1996, Parker began his employment with Cacique Distributors, U.S. He was hired as Director of Sales and Marketing. In December 1996, he received the title of Vice President of Sales and Marketing. When he was hired by Cacique Distributors, U.S., as a condition of his employment, Parker signed a Statement Regarding Confidentiality and Invention Assignment Agreement as well as a Confidentiality and Invention Assignment Agreement. Specifically excluded from Parker's agreement was his prior knowledge of the Cacique retail product line, Cacique's distribution patterns, and its key customer contacts in southern California, as Parker was already aware of these facts from his experience in the cheese marketing industry in California and nationally, beginning in 1983. Also excluded were national dairy industry and food service industry key customer contacts which he had learned of based on his prior experience in the food industry. Cacique was successful with Parker as its Vice-President, as its sales grew each year in which Parker was employed, including his first year.

### 3. Parker's Employment After Cacique, But Prior to V&V

On January 7, 2002, de Cardenas, Sr. advised Parker that his services were no longer desired, and that his employment was being terminated. In that same conversation, or shortly thereafter, Parker advised de Cardenas, Jr., Sr. that he was not in a frame of mind to pursue a future in the cheese industry. However, Parker did not agree to refrain from working in the

cheese industry. Cacique did not request that Parker sign, and he did not sign, a non-solicitation or non-competition agreement. After Parker's employment with Cacique was terminated, Parker contacted several recruiters and other individuals who Parker thought might lead him to possible career opportunities, either inside or outside of the cheese industry. Sometime between February and April of 2002, Tirso Iglesias ("Iglesias"), Vice President of Sales for Cacique Distributors, U.S., contacted Parker to inform him of a job opening at the Wisconsin Cheese Group. Subsequently, Parker contacted the Wisconsin Cheese Group about the available position. Shortly after Parker began discussions with the Wisconsin Cheese Group about a possible job opportunity, Cacique's attorney, George Salmas, sent a letter to the Wisconsin Cheese Group to inquire about its discussions with Parker regarding the position. In his letter to the Wisconsin Cheese Group, Salmas stated that Parker had signed a confidentiality agreement with Cacique. He also stated that Parker would not be able to abide by his confidentiality obligations to Cacique if he was employed by the Wisconsin Cheese Group. The Wisconsin Cheese Group never offered Parker the job. Subsequently, Parker interviewed with other companies, including Foster Farms (a dairy operation in Modesto, California), Class Time (a Mexican producer of gelatins and drinks), DPI (a cheese distributor), and various headhunters and recruiters. On June 15, 2002, Parker accepted a position with TracFone Wireless as its Senior Vice President of new business development. While at TracFone, Parker was responsible for the sales and marketing of prepaid cellular phone plans to Hispanic customers in retail and club store locations. Parker decided to leave TracFone in May 2003 when he realized that his position had changed from developing new business, to more of a key account manager for Safeway.

*4. Parker's Employment With V&V*

Parker was hired by V&V in May 2003. V&V contends that when Parker interviewed with its company, he was told that his responsibility would be to bring organization to its sales force. V&V also asserts that it told Parker it had no desire to learn any information that Parker had regarding Cacique. Upon being hired by V&V, Parker agreed that he would not use or disclose whatever information he had about Cacique. Parker was subsequently hired by V&V, and he reports to Gilberto Villasenor, II ("Villasenor II").

There are four categories of alleged trade secrets that Cacique contends V&V has misappropriated. Those four categories include Cacique's: (1) knowledge of nationwide Mexican dairy product sales volumes and patterns; (2) marketing strategy regarding Mexican style cream; (3) long term marketing plans, expansion strategies, and the reasoning behind them; and (4) 2001 Marketing plan. In addition, Cacique maintains that Defendants will inevitably misappropriate Cacique's : (1) proprietary information on stores, brokers, and distributors; (2) Cacique's proprietary market research; (3) national cheese distribution strategies ; and (4) national pourable cream distribution strategies.

## II. Legal Standards

### *A. Summary Judgment Standard*

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. All inferences must be drawn in the light most favorable to the

nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, the Court

accepts the nonmoving party's version of any disputed facts; however, those facts must be

supported by relevant, admissible evidence. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d

560, 562 (7th Cir. 1996).

It is the moving party's burden to demonstrate the absence of genuine issues of material

fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel.

Co., 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving

party must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule

56(e); Celotex, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the

non-moving party cannot rest on the pleadings alone, but must designate specific facts in

affidavits, depositions, answers to interrogatories or admissions that establish that there is a

genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

### B. Legal Standard for Misappropriation of Trade Secrets

Illinois state courts have noted that "[t]he protection afforded trade secrets reflects a

balancing of conflicting social and economic concerns." Service Center of Chicago, Inc. v.

Minogue, 535 N.E.2d 1132, 1135 (Ill. App. Ct. 1989) (citing ILG Industries, Inc. v. Scott, 273

N.E. 2d 393 (Ill. 1971)). While courts must acknowledge and respect the fact that an employer

"invested time, money and effort in developing a secret advantage," which should be protected

from a former employee who obtains the secret through improper means, the court must

recognize that, "in a society based on competition, the employee has a right to make use of the

general knowledge and skills acquired through experience in pursuing the occupation for which

he is best suited. " Minogue, 535 N.E. 2d at 1135 (internal citations omitted).

In order for Cacique to have an actionable claim, the Court must determine that a trade secret exists. The Illinois Supreme Court has defined a trade secret as, "a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it." ILG, 273 N.E. 2d at 395 (internal citations omitted) The Illinois Trade Secrets Act, 765 ILCS 1065/2(d) (hereinafter "ITSA") defines a trade secret as the follows:

> (d)"Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

Id. In particular, Illinois courts have noted the purpose of the language, "sufficiently secret to derive economic value. . .from not being generally known to other persons who can obtain economic value from its disclosure and use" is "to preclude protection for information not generally known to the public but clearly understood in a particular industry." Minogue, 535 N.E.2d at 1136 (quoting Melvin F. Jaeger, Trade Secrets Law, § 3.04 at 3-34 (1988)).

There are several factors to be considered in order to determine whether a trade secret actually exists. These factors include: "(1) the extent to which the information is known outside of plaintiff's business; (2) the extent to which the information is known by plaintiff's employees and others involved in the business; and (3) the extent of measures taken by plaintiff to guard the

secrecy of the information." <u>Rockwell Graphic System v. Dev. Indus.</u>, 730 F.Supp. 171, 178

(N.D. Ill. 1990 (internal citations omitted).

As previously stated, there are four categories of alleged trade secrets that Cacique

contends V&V has misappropriated. Those four categories include Cacique's: (1) knowledge of

nationwide Mexican dairy product sales volumes and patterns; (2) marketing strategy regarding

Mexican style cream; (3) long term marketing plans, expansion strategies, and the reasoning

behind them; and (4) 2001 Marketing plan. In addition, Cacique maintains that Defendants will

inevitably misappropriate Cacique's : (1) proprietary information on stores, brokers, and

distributors; (2) Cacique's proprietary market research; (3) national cheese distribution strategies;

and (4) national pourable cream distribution strategies. Each allegation will be discussed in

turn.

## III. Trade Secrets That Cacique Alleges Have Been Misappropriated

### A. Cacique's Knowledge of Nationwide Mexican Dairy Product Sales and Patterns

Cacique contends that the methods by which it attains information concerning Mexican

Dairy product sales and patterns is a trade secret. Plaintiffs believe that through the investment

of substantial time and effort, Cacique is able to track the quantity of its products that are sold in

total and in various regions, which gives Cacique unique detailed knowledge about the

marketplace. Cacique states that this sales data is used to formulate marketing strategies,

determine the best product mix in a region, allocate marketing funds, and make other strategic

decisions, and thus gives the Plaintiffs a competitive advantage that Cacique contends will be

compromised if a competitor becomes aware of this information.

Defendants contend that Plaintiffs fail to identify any specific product's sales volume, and they fail to identify any specific product or store's sales volume and/or pattern, thereby failing to identify a specific trade secret. In addition, Defendants contend that even with the one example Plaintiff's use, the Northgate Markets store, Plaintiffs fail to provide the specifics of the actual sales volumes or patterns information they acquired from that store. Further, Defendants contend, this one example does not substitute for the requirement to specifically identify all the trade secrets at issue, and Defendants contend that there is no evidence to suggest that any other sales volume and pattern information is identical or substantially similar to the Northgate Market example. Finally, Defendants assert that Plaintiffs cannot use a four-year-old, single-city survey as a tool to convert unidentified, nationwide sales volumes and patterns to trade-secret status. In addition, Defendants contend that Cacique's demographic information can be readily obtained from public sources, including the U.S. census data, Mexican consulates in the United States, and from reports purchased from third parties, and therefore, cannot be deemed "secret" information.

In essence, in their arguments in support of their respective positions, the parties are arguing two distinct points, and fail to address the same discrete issues. Plaintiffs do not contend that the individual data sources, or any sales product are the trade secrets at issue. Rather, Plaintiffs argue that it is the process and method of attaining nationwide Mexican dairy sales and patterns that is the trade secret at issue. From the evidence on record, Plaintiffs have presented sufficient evidence to raise a genuine issue of material fact concerning whether the process by which it attains data is sufficiently secret to derive economic value from not being generally known to other persons, and is the subject of efforts that are reasonable to maintain its secrecy or confidentiality. Consequently, at this stage of the parties' proceedings, the Court cannot find, as

-24-

a matter of law, that Cacique's method of acquiring knowledge of nationwide Mexican sales and dairy patterns is not a trade secret.

### B. Cacique's Marketing Strategy Regarding Mexican Style Cream

Cacique notes that Mexican style pourable cream is a staple in Mexican households, but because it is used almost exclusively by persons of Mexican heritage who buy it from stores under represented in Scan Data reports, it is one of Cacique's most under reported products, as Scan Data reports indicate that very little is sold. Further, this pourable cream is highly perishable, and to someone studying the marketplace, it appears to be a highly perishable product that does not sell well. However, Cacique contends this pourable cream is its second largest seller in its entire line of products. Consequently, Cacique asserts that its marketing strategy related to the sale of this pourable cream cheese is a trade secret.

Defendants contend that Cacique's marketing strategy regarding pourable cream cheese is not a trade secret, as Defendants contend that all Chicago area competitors have had a pourable cream strategy for several years. In addition, V&V contends that long before hiring Wilford Parker, V&V was in the process of introducing a pourable cream product to compete with the other competitors in the Chicago market who used this strategy. Consequently, Defendants argue, there is no secret of Cacique's to be protected.

Although Defendants contend that all Chicago-area competitors have used the same pourable cream strategy, and that the strategy is not unique, there is a genuine issue of material fact as to whether this strategy is indeed unique to the Plaintiffs, and whether V&V was only able to learn of this strategy through the misappropriation of Cacique's trade secrets. Both Plaintiffs

and Defendants provide sufficient evidence concerning whether this pourable cream strategy was unique to the Plaintiffs, or was a widely used strategy in the industry. Therefore, there is a genuine issue of material fact for trial.

### C. Cacique's Long Term Marketing Plans, Expansion Strategies, and the Reasoning Behind Them

Cacique contends that Parker has detailed knowledge of Cacique's long term marketing plans and product expansion strategies. Cacique contends that Parker has misappropriated this information and applied it to V&V's benefit. As an example, Cacique cites its strategy for expanding cheese sales in the Chicago area. Further, V&V notes that after Parker joined V&V as its Vice-President of Sales, V&V began selling its pourable cream in the same method that Cacique has. Cacique maintains that V&V offers its product at a price substantially below Cacique's, and believes that V&V has taken pourable cream sales away from Cacique. In addition, Cacique states that it has been executing its pourable cream strategy since approximately 1997, but V&V never made a countermove to "neutralize" it until after Parker joined V&V in May of 2003. It is the timing of V&V's decision to use this strategy to sell pourable cream that Cacique believes demonstrates that Parker and V&V misappropriated its trade secrets.

The example used to support this claim involves V&V's marketing of pourable cream. But, Plaintiffs fail to allege how this particular subsection of alleged trade secrets, "Long term Marketing Plans, Expansion Strategies and the Reasoning Behind Them," differs in any material respect from the alleged misappropriation of its pourable cream cheese strategy. In addition,

-26-

Plaintiffs fail to offer any evidence in support of its contention that other trade secrets fall within this subsection. Therefore, to the extent that Plaintiff's long term marketing plan, expansion strategies and the reasoning behind them addresses alleged trade secrets beyond the pourable cream strategy, Defendants' motion for summary judgment is granted.

### D. Information From Cacique's 2001 Marketing Plan

In 2001, V&V commissioned Towers Perrin, a global consulting company, to analyze the Mexican dairy business and recommend how V&V could increase sales.[3] Cacique contends that some of Tower Perrin's recommendations are expressly based upon information taken from Cacique's 2001 marketing plan. Cacique contends that the 2001 Marketing Plan is an internally produced document that was distributed to authorized recipients. Finally, Cacique notes that during the deposition of Phillip Villasenor ("Villasenor"), chief of V&V's manufacturing operations, Villasenor noted a cheese strategy that Cacique contends was remarkably similar to its own. Cacique contends that this is evidence of V&V's misappropriation of trade secrets adopted from the Towers Perrin report, and shows Defendants' propensity for misappropriating its trade secrets.

Assuming, *arguendo*, that Towers Perrin did misappropriate Cacique's 2001 Marketing Strategy, Plaintiffs fail to show how this clearly demonstrates that V&V misappropriates Cacique trade secrets. From the facts provided to the Court, there is no indication that V&V deliberately used any Cacique information in formulating any business strategies from the information

---

[3] On January 20, 2004, Plaintiff was granted leave to file a second amended complaint, and on January 21, 2004 Cacique filed a second amended complaint, adding Towers Perrin as a defendant. However, on September 16, 2004, the Parties filed a stipulation, dismissing all claims for relief against Towers Perrin. Therefore, Towers Perrin is no longer a party in this cause of action.

received by Towers Perrin. In addition, there is no indication that Defendants would have been aware that any information in the Towers Perrin report may have been from Cacique documents. Further, this information is not relevant to whether Wilford Parker was the catalyst in the misappropriation of Cacique trade secrets, as he was still working for Cacique at the time the Towers Perrin report was commissioned. Consequently, to the extent that Plaintiffs are requesting damages for the alleged misappropriation of its 2001 Marketing Plan, Defendants' motion for summary judgment is granted.

### III. Trade Secrets Which Plaintiffs Allege Defendants Will Misappropriate in the Future

Cacique contends that it has found the best stores, brokers and distributors to sell Mexican dairy goods in the different U.S. markets, and Cacique contends that it protects this information as trade secrets. Cacique maintains that Parker is aware of this information, yet V&V is not aware of this information, because it does not do business in many areas that Cacique does. Cacique contends that prior to working for Cacique, Parker was not aware of the selling or marketing of Hispanic style dairy products to Hispanics. Plaintiffs argue that given the fact that V&V plans to expand nationally, it will be impossible for Parker not to misappropriate Cacique's trade secrets, as he helps V&V devise business strategies that will compete directly with Cacique. As a consequence, Cacique contends that V&V will inevitably disclose Plaintiffs': (1) proprietary information on stores, brokers and distributors; (2) proprietary market research; (3) national cheese distribution strategy; and (4) national pourable cream distribution strategy.

V&V contends that Cacique's belief that Parker will inevitably disclose its trade secrets is unfounded for three reasons. First, Defendants note that Parker had a 16-month hiatus between

-28-

his employment with Cacique and V&V from the Hispanic cheese industry. V&V contends that due to the volume of detailed statistical data that comprises most of the alleged trade secrets, it would be impossible for Parker to retain all of that information in his memory. Second, V&V notes that it has requested, and Parker has agreed, that no proprietary information of Cacique's will be used or disclosed by Parker (and Defendants contend that during his time with V&V, Parker has not disclosed any of Cacique's trade secrets). Third, Defendants contend that Parker has not been duplicitous, or otherwise acted in bad faith. Consequently, Defendants contend, the Court should find, as a matter of law, that Parker will not inevitably disclose any of Cacique's trade secrets during his employment with V&V.

The Seventh Circuit has noted, "there is little law in Illinois or in this circuit establishing what constitutes threatened or inevitable misappropriation." PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1268 (7th Cir. 1995). The PepsiCo Court analyzed the holdings in Teradyne, Inc. v. Clear Communications Corp., 707 F.Supp. 353 (N.D. Ill. 1989) and AMP Inc v. Fleischhacker, 823 F.2d 1199 (7th Cir. 1987), and came to the conclusion that "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that the defendant's new employment will inevitably lead him to rely on he plaintiff's trade secrets." PepsiCo, 54 F.3d at 1269 (internal citations omitted). Further, in explaining what type of information must be at issue for the purpose of "inevitable disclosure," the PepsiCo court noted,

> It is not the 'general skills and knowledge acquired during his tenure with'
> [plaintiff] that [plaintiff] seeks to keep from falling into [defendant's] hands, but
> rather 'the particularized plans or processes developed by [plaintiff] and disclosed
> to him while the employer-employee relationship existed, which are unknown to
> others in the industry, and which give the employer an advantage over his
> competitors.'

PepsiCo, 54 F.3d at 1269 (citing AMP, 823 F.2d at 1202).

Notably, there are factual similarities between this case and PepsiCo. In PepsiCo, Quaker, the defendant, noted that the employee in question already signed a confidentiality agreement not to disclose any trade secrets or confidential information from his earlier employment. PepsiCo, 54 F.3d at 1270. In this case, as previously noted, Defendants cite to the confidentiality agreement signed by Parker, stating that he will not disclose any of Cacique's confidential information to V&V. In addition, this case is similar to PepsiCo in that Plaintiffs are contending that the Defendant company, "unfairly armed with knowledge of [Cacique's] plans, will be able to anticipate its distribution, packaging, pricing, and marketing moves." Id. at 1270. Defendants contend, however, that because there are no allegations that Parker acted in bad faith by not exercising full candor with Cacique (as the Plaintiff in PepsiCo failed to do), the Court cannot find that Parker will inevitably disclose Cacique trade secrets. see PepsiCo, Id. at 1270-71. However, it should be noted that in PepsiCo, the Seventh Circuit noted that, although it felt the district court could have found a lack of candor and good faith on the part of the Defendants, the district court did not have to come to this conclusion in order to grant Plaintiff's motion for a preliminary injunction on the issue of inevitable disclosure. Id. Therefore, in the PepsiCo case, evidence of bad faith and a lack of candor was not dispositive in granting Plaintiff's motion for a preliminary injunction for inevitable disclosure of trade secrets. Id. Further, there is still a genuine issue of material fact concerning whether Parker has already disclosed certain trade secrets to V&V, which undoubtedly would be evidence of bad faith on the part of Parker. In addition, while the fact that there was a 16-month hiatus between Parker's employment with Cacique and V&V may turn out to be an important factor in judging whether

-30-

Parker has disclosed, or will inevitably disclose, Cacique trade secrets, that factor is not significant enough to allow this Court to find, as a matter of law, that Parker did not disclose, or will not inevitably disclose, Cacique trade secrets to V&V. A 16-month hiatus does not necessarily erase the knowledge gained from the 6 years of experience Parker had with Cacique. Finally, Defendants contend that it would be impossible for Parker to memorize the amount of information that Cacique is alleging to be trade secrets, and that any information that Parker has outside of those documents is part of his generalized knowledge of the cheese industry. However, both Plaintiffs and Defendants have provided sufficient information to raise a genuine issue of material fact concerning whether any information disclosed to Parker was of such a general nature that it cannot be considered a trade secret, or rather, "it was the particularized plans or processes developed by [plaintiff] and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." PepsiCo, 54 F.3d at 1269 (citing AMP, 823 F.2d at 1202). Therefore, Defendants' motion for summary judgment on the issue of inevitable disclosure is denied.


## IV. Additional Arguments Made by Defendants in Support of Their Motion for Summary Judgment

Defendants contend that Cacique's trade secrets are not "secret", because there is no economic value derived by maintaining the information's secrecy. However, Cacique has presented the Court with sufficient evidence to raise a genuine issue of material fact concerning the economic advantages Cacique gains from planning and promotion, the allocation of

-31-

advertising funds, and understanding the value of promoting its pourable cream cheese it the manner it does.

In addition, Defendants contend that other former Cacique sales and marketing employees have left Cacique and not been the subject of a lawsuit. Defendants cite two examples. First, Defendants note that Alberto Fernandez, who was Cacique's head of marketing, left in late 2001 to start his own company which specialized in providing marketing services to the food industry and other companies wishing to target the Hispanic market, yet Cacique did not seek to restrict his activities. In addition, Defendants contend, while Parker was working for TracFone Wireless, Defendants state that he was responsible for sales and marketing to Hispanic customer, including purchasers of ethnic cheese products, yet Cacique took no action to restrict his activities at TracFone Wireless. However, in noting these facts, Defendants admit that Fernandez's business and Parker's responsibilities at TracFone Wireless did not directly compete with Cacique. Further, if Cacique had no reason to believe that its trade secrets were in danger of disclosure in these past instances, then there was no need for Cacique to file a lawsuit at those times. Consequently, these past issues are not relevant to the suit presently before the Court.

Finally, Defendants contend that Plaintiffs admitted that no trade secrets of Cacique, Inc. are at issue, and only the trade secrets of Cacique Distributors, U.S. are relevant to this case. As such, Defendants contend that summary judgment should be granted in their favor against Cacique, Inc., However, Plaintiffs are correct when they assert that Defendants' requests for summary judgment against Cacique, Inc. is based upon a partial answer to a deposition question by de Cardenas, Jr., and that de Cardenas, Jr. later supplemented his answer to name trade secrets of Cacique, Inc. Consequently, the Court will not grant summary judgment against Cacique, Inc.

-32-

## CONCLUSION

For the foregoing reasons, Defendants' motion to strike is GRANTED in part and DENIED in part. Plaintiffs' motion to strike is DENIED. Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

Enter:

_____

David H. Coar
United States District Judge

Dated: **September 29, 2004**